UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BERTRAM PAYNE,

                           Plaintiff,

                                                               1: 11-CV-1012
v.                                                               (GTS/RFT)

FRITO-LAY, INC.,

                           Defendant.
_____

APPEARANCES:                                       OF COUNSEL:

BERTRAM PAYNE, 07-A-3249
  Plaintiff, *Pro Se*
Watertown Correctional Facility
23147 Swan Road
Watertown, NY 13601

LAW OFFICES OF RICHARD J. DaVOLIO, PC       RICHARD J. DaVOLIO, ESQ.
  Counsel for Defendant
160 Main Street, Suite 104
Sayville, NY 11782

GLENN T. SUDDABY, United States District Judge

## **DECISION and ORDER**

       Currently before the Court, in this product liability action filed *pro se* by New York State correctional facility inmate Bertram Payne ("Plaintiff") against Frito-Lay, Inc. ("Defendant"), is Defendant's motion for summary judgment. (Dkt. No. 31.) For the reasons set forth below, Defendant's motion is granted and Plaintiff's Complaint is dismissed.

I.      RELEVANT BACKGROUND

   A.      Plaintiff's Complaint

Generally, in his Complaint, Plaintiff alleges that, on December 6, 2010, while he was incarcerated at Eastern N.Y. Correctional Facility, he bit into a Cheetos Puff that contained a dead, dried worm, causing him to experience sweating, dizziness, stomach pains, rapid heartbeat, nausea, vomiting, diarrhea and significant weight loss. (Dkt. No. 1, Attach. 1.) Because this Decision and Order is intended primarily for the review of the parties, the Court will not recite in detail the remaining factual allegations of Plaintiff's Complaint, but will refer the reader to the Complaint in its entirety. (*Id.*)

Construed with the utmost of special liberality, Plaintiff's Complaint asserts four claims against Defendant based on these factual allegations: (1) negligence, (2) strict products liability, (3) breach of express warranty, and (4) breach of implied warranty. (*Id.*)

   B.      Undisputed Material Facts

Based on the current record, the following material facts are undisputed.[1]

On September 16, 2010, Plaintiff went to the hospital at Eastern N.Y. Correctional Facility with complaints of "stomach pains and diarrhea," which he believed resulted from him "eating rice diablo and Mexican corn that was served in the mess hall." (Dkt. No. 45, Attach. 2, at 3-4 [pages "39" and "40" of Plf.'s Depo. Tr.].)

---

[1] The Court notes that, on March 11, 2014, Defendant submitted five pages of documents omitted from its motion for summary judgment. (Dkt. No. 45.) The Court previously requested those documents, and hereby accepts them, because their omission from Defendant's motion papers was clearly inadvertent, and because they were previously provided to Plaintiff (three of the documents being pages from Plaintiff's own deposition, and the remaining two documents–a laboratory report and page of photographs–having been provided to Plaintiff on August 3, 2012). (Dkt. No. 28, Attach. 2, at 5-7.)

On November 20, 2010, Plaintiff received a visit from his mother at Eastern N.Y. Correctional Facility. At that time, she brought a package that included an 8 ½-ounce bag of Cheetos Puffs Cheese Flavored Snack. After the visit was complete and his mother had left the facility, Plaintiff retrieved the package and brought it back to his cell.

The bag of Cheetos Puffs was sealed until it was first opened by Plaintiff on December 6, 2010, at approximately 11:30 p.m. At the time, his desk lamp light was turned on. When he opened the bag, he smelled no unusual aroma coming from the bag. He reached into the bag between 10 and 15 times before anything unusual occurred.

During those 10 to 15 times that he reached into the bag, he smelled no unusual aroma coming from the bag. He would take some Cheetos Puffs without looking at them first. He would also occasionally bite and hold onto a Cheetos Puff; but again he did not look at it. The first unusual aroma he smelled coming from the bag came after he bit into a Cheetos Puff that was a "little soft [and] had a sour taste."

Because Plaintiff had completely eaten the Cheetos Puff in question, that Cheetos Puff was no longer available for examination. As a result, Plaintiff tilted the bag and poured out another Cheetos Puff, which he examined. This other Cheetos Puff was partially brownish or blackish in color. He touched it and it felt soft to him. It contained "what appeared [to him] to be," or "what looked [to him] like," a dead, dried worm. (Dkt. No. 1, Attach. 1, at ¶ 7 [Plf.'s Verified Compl.]; Dkt. No. 31, Attach. 12, at 13 [page "25" of Plf.'s Depo. Tr.].) Upon concluding that the brownish or blackish part was the same type of soft and sour material that he had just eaten, Plaintiff then spit up or vomited up the Cheetos Puff in question. He did not pour out or touch any of the other Cheetos Puffs in the bag, or inspect the bag itself. He then rolled the bag up and put the bag away in his locker.

3

That night, Plaintiff did not call any of the corrections officers to come to his aid, nor did he show them the bag of Cheetos Puffs; instead, the next morning, on December 7, 2010, he requested that he go to facility hospital. (Dkt. No. 31, Attach. 12, at 32 [page "32" of Plf.'s Depo. Tr.]; Dkt. No. 45, Attach. 2, at 2 [page "33" of Plf.'s Depo. Tr.].)

Between December 7, 2010, and December 28, 2010, Plaintiff went to the facility hospital five times, and complained of sweating, dizziness, stomach pains, raid heartbeat, nausea, vomiting, and/or diarrhea. (Dkt. No. 36, at 24-35 [Plf.'s Med. Records]; Dkt. No. 1, Attach. 1, at ¶¶ 8, 10-13 [Plf.'s Verified Compl.].)

On December 9, 2010, medical staff offered to send the Cheetos Puffs to a lab; however, Plaintiff declined. (Dkt. No. 36, at 28; Dkt. No. 36, at ¶ 24.)

In approximately April of 2012, Plaintiff provided the bag and its contents to Defendants. (Dkt. No. 22.)

In approximately June of 2012, two of Defendant's employees, Laurie Sena and T. Collins, inspected the bag and its contents, and issued a laboratory report of the inspection. (Dkt. No. 45, Attach. 1, at 2 [Lab Report]; Dkt. No. 28, Attach. 2, at 5 [Lab Report].) In addition, photographs were taken of the contents. (Dkt. No. 45, Attach. 1, at 3-4 [Photographs]; Dkt. No. 31, Attach. 13, at 2 [Photograph]; Dkt. No. 28, Attach. 2, at 6-7 [Photographs].) The report stated, in pertinent part, as follows:

> The package contains approximately 52 grams of remaining Cheetos product. . . . The remaining product is dry and crisp and there does not appear to be any moisture defects from manufacturing. The alleged foreign material consists of 3 pieces of Cheetos Puffs in the sample that have a small amount of dark colored material attached to the outer surface of the Puff. Only 1 of the Puffs appears to have a solid residue on the surface, the [sic] other 2 Puffs just appear to be discolored from the contact with a similar material. The material that is on the Puff measures approximately 40 mm X 3 mm in size and it has a rigid and nonflexible

> texture. The dark colored material does not have any of the orange
> colored cheese seasoning residue on the outer surface that all of the other
> Cheetos Puffs in the package have. There is some orange seasoning
> present on the Cheetos Puff underneath the dark material therefore [sic] it
> appears that the product was exposed to this material sometime after it
> passed through the seasoning application process in manufacturing. The
> material attached to the Puffs has been examined closely under a stereo
> microscope and it appears to be an ingredient related residue from the
> manufacturing process. This material appears to have some black carbon
> particles from some charred product mixed with some polymerized
> vegetable oil from the manufacturing process. It appears that residue is a
> by-product of the manufacturing process which may have accumulated on
> some manufacturing equipment and then rubbed off on the product. This
> incident appears to be a processing related incident and the alleged foreign
> material is made up of some of the ingredients used to manufacture the
> Cheetos product.

(Dkt. No. 45, Attach. 1, at 2 [Lab Report]; Dkt. No. 28, Attach. 2, at 5 [Report].)

On September 27, 2012, Irv Harris, a Quality Enabler employed by Defendant, issued an affidavit based on his familiarity with the Cheetos product manufacturing process and sanitation quality program, and his review of the inspection report and photographs. (Dkt. No. 31, Attach. 5 [Payne Affid.].) In his affidavit, Mr. Harris stated, inter alia, that "the [high- pressure] extrusion process [used by Defendant to make Cheetos Puffs out of finely ground corn meal] ensures that no foreign objects, such as a worm, can make it through and enter the cooking and baking process." (*Id*. at ¶¶ 4, 9.) Mr. Harris also stated, inter alia, that the "burn marks on certain portions of the Cheetos Puff[s in question] . . . could be caused through the processing and cooking of the Cheetos Puff [during which it is cooked at a temperature of approximately 300 degrees) where it might have come in contact with a heating element, or it was enacted upon and caused by an outside heat source of some type, out of the control of the defendant . . . . The product, as . . . depicted in the photographs, shows a product that is . . . without any . . . foreign object contained within it." (*Id*. at ¶¶ 10-11, 13.)

### C. Parties' Arguments on Defendant's Motion

#### 1. Defendant's Memorandum of Law in Chief

Generally, in its memorandum of law in chief, Defendant asserts five arguments. (Dkt. No. 31, Attach. 3 [Def.'s Memo. of Law].)

First, argues Defendant, as a threshold matter, all of Plaintiff's claims should be dismissed for failure to state a claim upon which relief may be granted, because they fail to allege facts plausibly suggesting that the bag of Cheetos Puffs contained a worm. (*Id*. at 4-5.) In the alternative, Plaintiff has failed to adduce admissible record evidence that the bag of Cheetos Puffs contained a worm. (*Id*.)

Second, argues Defendant, Plaintiff's claim of strict liability should be dismissed because he has failed to adduce admissible record evidence from which a rational fact finder could conclude that (1) the Cheetos Puff contained a foreign substance (much less one that rendered it unreasonably dangerous), (2) the foreign substance existed when the bag of Cheetos Puffs left Defendant's control, (3) Plaintiff would not have been able to discover the foreign substance in the bag of Cheetos Puffs through the exercise of ordinary diligence, and (4) the foreign substance was a substantial factor in causing his injuries (given that he complained of the same injures a few months before the incident). (*Id*. at 2-4.)

Third, argues Defendant, Plaintiff's claim for breach of implied warranty should be dismissed, because (1) the legal standard governing this claim focuses on the consumer's reasonable expectations for the product when used in the customary, usual and reasonably foreseeable manner, and (2) here, the reasonable expectations of a consumer are such that a product when cooked may become burnt, which may be reasonably discovered by the consumer through looking at the product. (*Id*. at 6-7.)

Fourth, argues Defendant, to the extent that Plaintiff seeks to assert a claim of a breach of an "expressed warranty," that claim should be dismissed, because he has neither alleged facts plausibly suggesting, nor adduced admissible record evidence establishing, that Defendant made any express warranty that the product would "perform" a certain way. (*Id*. at 2, 6-7.)

Fifth, argues Defendant, Plaintiff's claim of negligence should be dismissed, because he has failed to adduce admissible record evidence from which a rational fact finder could conclude that the bag of Cheetos Puffs was defective (in that it was made without reasonable care) and that, when put to its normal intended use, it was dangerous. (*Id*. at 7-8.)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff asserts four arguments. (Dkt. No. 36, at 9-15.)

First, argues Plaintiff, he has established a claim of strict liability because (1) his medical records from immediately after his consumption of the Cheetos Puff (which expressly reference a "worm") demonstrate that the Puff contained a foreign substance that made him ill, rendering it unreasonably dangerous for consumption, and (2) the laboratory report and Quality Enabler's affidavit adduced by Defendant are so plagued by speculation, lack of specificity and lack of personal knowledge as to render them wholly inadmissible at trial (and those materials were precluded by a discover order issued by U.S. Magistrate Judge Randolph F. Treece). (*Id*. at 10-11 [pages "2" and "3" of Plf.'s Opp'n Memo. of Law].)

Second, argues Plaintiff, he has established a claim of negligence because (1) a rational fact finder could draw a reasonable inference that the Cheetos Puff he consumed contained a worm due to (a) the temporal proximity between Plaintiff's consumption of the Cheetos Puffs and the onset of his illness, (b) Plaintiff's testimony that the Cheetos Puff contained a worm, and

7

(c) the fact that his medical records contain references to the "worm," and (2) Defendant has not adduced the testimony of any witness with personal knowledge of the events in question. (*Id*. at 11-13 [pages "4" through "5" of Plf.'s Opp'n Memo. of Law].)

Third, argues Plaintiff, he has established a claim for breach of implied warranty because (1) he had a reasonable expectation that a product marketed to a consumer would not cause illness upon consumption, and (2) Defendant's assertion that the Cheetos Puff was merely burnt was conclusory and not based on personal knowledge. (*Id*. at 13 [page "5" of Plf.'s Opp'n Memo. of Law].)

Fourth, argues Plaintiff, Defendant has failed to meet its modest threshold burden of proving the absence of a dispute of material fact, because "the affidavits and reports from the expert . . . cannot be presented at trial pursuant to Rule 56(c)(2)." (*Id*. at 13-14 [pages "5" and "6" of Plf.'s Opp'n Memo. of Law].)

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply memorandum of law, Defendant asserts five arguments. (Dkt. No. 39.)

First, argues Defendant, Plaintiff does not provide any details as to how the product, which was in his possession for more than a year (along with a lighter or matches in his cell), was maintained in his possession. (*Id*. at 2.)

Second, argues Defendant, Plaintiff admits that the product seen in the photographs adduced by Defendant are true and accurate depictions of the product that Plaintiff turned over to Defendant. (*Id*.)

Third, argues Defendant, Plaintiff does not provide any details–only speculation and conjecture–as to how the product came to be in the condition that it was. (*Id*.)

Fourth, argues Defendant, contrary to Plaintiff's argument, the affidavit of Defendant's Quality Enabler, Irv Harris, was never precluded by Magistrate Judge Treece in his Discovery Order of August 20, 2012 (nor is the affidavit inadmissible based on a lack of personal knowledge). (*Id*.)

Fifth, argues Defendant, Plaintiff has not controverted Defendant's evidence that the Cheetos Puff depicted in the photographs contains merely a burn mark. (*Id*. at 3.)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standards Governing a Motion for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing Defendants' motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's recent decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard. The Court would add only three points.

First, to the extent that a defendant's motion for summary judgment under Fed. R. Civ. P. 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic*, 128 F .R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

9

Second, generally, to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft*, 556 U.S. at 679 (internal citation and quotation marks omitted). No opportunity to amend need be given to a pro se litigant where the defects in his claims appear substantive rather than merely formal, such that any amendment would be futile.

Third, returning to the subject of motions for summary judgment, in this District, for a non-movant to create a genuine dispute of material fact with regard to a fact asserted (and properly supported) in a movant's Statement of Material Facts, the non-movant must support his denial of that fact with an accurate record citation, assuming the non-movant, if pro se, has been properly advised of the consequences of failing to do so. *See* N.D.N.Y. L.R. 7.1(a)(3). Here, Plaintiff was so advised. (Dkt. No. 32, Attach. 1; *see also* Dkt. No. 4, at 2 [indicating that Plaintiff was sent a courtesy copy of the Local Rules of Practice on Aug. 25, 2011].) As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426-27 & n.4 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

B.  **Legal Standards Governing Plaintiff's Claims**

Because the parties have, in their memoranda of law, demonstrated an accurate understanding of the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for the review of the parties. (Dkt. No. 31, Attach. 3; Dkt. No. 36, at 9-15; Dkt. No. 39, Attach. 1.)

III.  **ANALYSIS**

After carefully considering the matter, the Court dismisses all of Plaintiff's claims for each of the alterative reasons stated in Defendant's memoranda of law. *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds only the following analysis.

At the outset, it must be remembered that Plaintiff did not see the Cheetos Puff that he consumed (either before or after he consumed it). *See, supra,* Part I.B. of this Decision and Order. Rather, he saw only *another* Cheetos Puff, which rolled out of the bag after he tipped it. *Id*. Granted, Plaintiff has adduced testimony that this other Cheetos Puff contained "what appeared [to him] to be" or "what looked [to him] like" a dead, dried worm. *Id*.

However, Defendant has adduced three forms of competent evidence establishing that the other Cheetos Puff did not in fact contain a dead, dried worm but a burn mark–laboratory report, photographs, and Harris affidavit. *Id.* Contrary to Plaintiff's argument, in his Discovery Order of August 20, 2012, Magistrate Judge Treece never precluded the laboratory report by Laurie Sena and T. Collins. (*See generally* Dkt. No. 30.) The Court notes that the laboratory report identified the material in question as "black carbon particles from some charred [corn meal and cheese seasoning] mixed with some polymerized vegetable oil from the manufacturing process."

*See, supra,* Part I.B. of this Decision and Order. Moreover, while Plaintiff is correct that certain parts of the Harris affidavit are inadmissible, other parts are admissible. For example, Mr. Harris stated, with sufficient specificity, material facts about Defendant's manufacturing process that were within his personal knowledge, based on his four years of experience as a Quality Enabler, and his review of both the laboratory report and photographs. *See, supra,* Part I.B. of this Decision and Order. Finally, Plaintiff does not even challenge the admissibility of the photographs, which do not appear to reveal a worm *inside* a Cheetos Puff but a burn mark *outside* of that Cheetos Puff. (Dkt. No. 45, Attach. 1, at 3-4 [Photographs]; Dkt. No. 31, Attach. 13, at 2 [Photograph]; Dkt. No. 28, Attach. 2, at 6-7 [Photographs].)

To controvert this evidence, Plaintiff asserts arguments that are unpersuasive. The existence of a worm is not established by the fact that Plaintiff experienced nausea immediately after he ate the Cheetos Puff in question. Rather, Plaintiff experienced nausea only after he concluded that he had eaten a soft brown material that appeared to him to be a dead worm. *Id.* For the sake of brevity, the Court will not linger on the fact that Plaintiff's medical records indicate that his symptoms and complaints were subjective in nature and were possibly caused by his *anxiety* that he had eaten a worm. (*See, e.g.,* Dkt. No. 36, at 28 [reporting assessment as "possible gastroenteritis vs. food-borne illness vs. anxiety causing [gastrointestinal symptoms]."].) More important, the fact that Plaintiff experienced nausea does not mean the Cheetos Puff contained a worm rather than burnt corn meal and cheese seasoning. Indeed, as Defendant points out, Plaintiff experienced similar nausea approximately two-and-a-half months before the incident in question, after eating a Mexican *corn* dish. *Id.*

Nor is the existence of a worm established by the references to a "worm" in Plaintiff's medical records. Only one of the medical records mentions the word "worm," and that medical

12

record does so only in the context of reciting Plaintiff's worry about what he may have eaten. (Dkt. No. 36, at 28 [stating that Plaintiff was "worried that he ate a worm or other contaminant"].)

All that a sympathetic fact finder is left with is Plaintiff's personal opinion about a Cheetos Puff that he never ate, couched in terms such as "what appeared to be" or "what looked like." Under the circumstances, this tepid personal belief amounts to speculation that is insufficient to defeat a motion for summary judgment. *See Kuck v. Danaher*, 07-CV-1390, 2012 WL 4904387, at *7 (D. Conn. Oct. 16, 2012) ("It is axiomatic that a party must present facts not legal conclusions, personal belief, or speculation couched as facts to survive summary judgment."); *Morisseau v. DLA Piper*, 532 F. Supp.2d 595, 617 (S.D.N.Y.2008) (noting that "statements of personal belief and speculation" in a witness declaration are inadmissible).

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 31) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1, Attach. 1) is **DISMISSED**. The clerk is directed to enter judgment in favor of the Defendans and close this case.

Dated: March 31, 2014
    Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge